**In re THOMPSON'S ESTATE.**

**KILMER v. THOMPSON et al.**
No. 34444.

Supreme Court of Oklahoma.
Sept. 29, 1953.

Drennan and Eddy, Medford, for plaintiff in error.

Ed Falkenburg, Enid, Roy W. Cox and Charles C. Buhrman, Blackwell, for defendant in error.

O'NEAL, Justice.

This record presents for our review the question as to the competency of Corwin Thompson to execute his will, and the disposition made of his property under the will. On April 13, 1946, Corwin Thompson executed three written instruments: (1) His will; (2) a written instrument under which he agreed at his death to will or deed all property owned by him to R. L. Lauver and Athlene Lauver, his wife; and (3) a deed to his farm in which the Lauvers were designated as grantees.

At the opening of the Cherokee strip in 1893, Corwin Thompson acquired a quarter section of land in Grant County, Oklahoma, upon which he resided until his death in October, 1946. For some years after he acquired title to the land, he and his wife, together with their minor sons, lived in a sod house which they constructed upon the land. Corwin Thompson had three sons, the eldest died early in life. John, the second son, and Harry, his brother, lived with their parents upon the farm

for periods of time hereafter referred to. His wife predeceased him in February, 1941. At the time of the trial below, his son, John, was sixty-two years of age and Harry, his brother, was sixty years of age.

The will was offered for probate by N. K. Kilmer, the plaintiff in error in the present action. John and Harry Thompson contested the will on the ground that their father was mentally incompetent to execute the will, and on the additional ground that Lauver and his wife occupied a confidential relationship to Corwin Thompson, and that he was under duress and undue influence when the will was executed.

The County Court admitted the will to probate. The order was set aside upon appeal to the District Court and proponent has appealed.

N. K. Kilmer will be referred to hereafter as the proponent, and John and Harry Thompson as the contestants.

The will bears date of April 13, 1946. Corwin Thompson died October 21, 1947. The will bequeaths to his sons, John and Harry, the sum of $1 each and to John's child or children, whose names are unknown, the sum of $1. He directs that all of his just debts, funeral expenses and costs of administration be paid from the money on hand and owned by him at the time of his death, and any balance remaining of said money he gives and bequeaths to his son, Harry Thompson. All the rest and residue of his property, including the farm, a quarter section of land located in Grant County, Oklahoma, he gives and bequeaths to R. L. Lauver and Athlene N. Lauver, his wife. The will contains the following statement: "This bequest is made due to the fact that they have cared for me in my old age and my children have failed and refused to care for me." The will designates N. K. Kilmer sole executor without bond.

The agreement referred to which was entered into on the 13th day of April, 1946, signed by Corwin Thompson, as first party, and R. L. Lauver and Athlene N. Lauver, as second parties, provides that the Lauvers agree to care and provide for Corwin Thompson during his lifetime, and contains a provision with reference to the division of crops to be raised upon the land, and contains a provision that Corwin Thompson agrees at his death to will or deed all property owned by him to the Lauvers, to become their property absolutely without any conditions or restrictions whatever in consideration of their caring for him for the remainder of his natural life. It states further that in the event that the Lauvers fail and refuse to carry out said agreement then, and in that event, the contract shall be null and void, and they shall receive nothing under said contract, except that they receive their share of the crop as tenants.

The third instrument was a warranty deed executed by Corwin Thompson conveying the farm land to the Lauvers. This deed was not delivered during Corwin Thompson's lifetime, but had been placed in a local bank under an agreement and understanding that Corwin Thompson could repossess himself of the deed upon demand.

Proponent, a banker residing at Medford, Oklahoma, testified that he had known Corwin Thompson for approximately twenty years; that Thompson signed the will at the bank in the presence of subscribing witnesses, and that Thompson was of sound mind at that time; that the deed referred to was also signed at the same time and left with the bank, with the understanding that Thompson could repossess it at any time upon request. Proponent also advised Thompson not to execute the will or the other documents referred to. On examination the witness was asked:

"Q. You state that Mr. Thompson always made up his own mind after asking advice from you and Mr. Drennan, did he ever fail to take your advice? A. Well, I told him not to do this. I advised him not to do this.

"Q. Why not? Why did you tell him not to? A. Well, I thought he was in a place where he ought to see how it would work out.

"Q. Wasn't it because of your impression of this whole deal, founded on your sense of the injustice and harshness of the whole arrangement and the injustice of it especially as far as Harry was concerned?

A. Well, I just thought that he should leave the farm there to Harry, if he could get Harry to stay there and take care of him. If he could get Harry to stay there and take care of him, I thought that was the arrangement for him to make."

Proponent's counsel testified that Thompson and the Lauvers came to his office on several occasions and discussed the matter of the execution of the will, contract and deed. He stated: "well, we discussed the matter, and Mr. and Mrs. Lauver were a bit reluctant at that time in the matter. I talked to them and told them if this arrangement were made, there would in all probability be a hard contested lawsuit over it."

In our disposition of the case we lay aside the suggestion that the Lauvers exercised duress and undue influence in procuring Thompson to execute the will, contract and deed. We think there is a failure of proof to support that allegation. Our determination of the case is limited to the question of the competency of Corwin Thompson to execute the will and other instruments on the date of their execution.

A doctor of medicine who had treated Mr. Thompson periodically from 1939 to 1947, testified that his patient had high blood pressure, nephritis, which tended to produce brain changes, changes of the mind, memory and attitudes. Mr. Thompson's conversation was radical and inconsistent. He summarized by stating: "I think he was confused about the things he told me about his wife and her symptoms and his own symptoms, he would tell one thing one time and another at another time." As a physician, he gave it as his opinion that Thompson was not of sound mind when he executed the will.

A medical doctor testified that he took care of Thompson for a period of six months prior to his death, and that in his opinion Thompson was competent to execute the will.

Approximately fifteen witnesses, friends and neighbors of Mr. Thompson testified that he apparently was greatly dissatisfied with the arrangements he had made with the Lauvers. These witnesses were unable to give any definite statement as to whether or not Mr. Thompson was mentally competent to execute the will. One of the witnesses, James D. Sears, gave the most direct evidence on the matter. He testified as to Thompson's irrational treatment of his two sons, and stated that on many occasions when Thompson came to Medford, he would join a group in a game of cards and that without any cause or provocation of any kind, he became very angry and would leave the game without any explanation. This happened on four or five different occasions.

The testimony of the contestant, John Thompson, is to the effect that he lived with his parents until the year 1910; that after his discharge from the army he married and lived on the farm, making crops for two years. He then moved to Minnesota and was engaged in business for about twenty years. During these years he corresponded with his mother frequently. He returned home on a visit in 1941, and finding his mother very ill, stayed on until her death. He returned to Minnesota, disposed of his business and returned to his father's farm and operated the farm and made crops for about three years. Thereafter, he and his family moved to Blackwell, from which point he made occasional visits to the farm. This family history is detailed, as proponent vigorously contends that the contestant, John Thompson, uniformly neglected his father, which resulted in his disinheritance.

As to the contestant, Harry Thompson, the evidence discloses that he was mentally defective from infancy. Physically, he was reasonably competent to perform farm work or other ordinary labor. He stayed at home during various periods and at times worked away from home. He did both farm and household work after his mother died in 1941.

The witness, John Thompson, over the objection and exception of proponent, was permitted to testify that he observed his father's physical and mental condition during the latter years of his life; that his father was incapable of making decisions and adhering to them; that his physical condition became progressively worse, his eyesight had entirely failed and he could hear

with great difficulty; that he couldn't carry on an intelligent conversation with reference to his business affairs; that from his observation of his father's action and conduct, he was of the opinion that his father was incompetent and was of unsound mind on April 13, 1946, the day the will was executed.

Proponent for reversal contends that the testimony of John Thompson was improperly admitted, and that if the same was excluded from consideration that the remaining evidence does not support the court's judgment. Specifically, it is contended that John Thompson's evidence is incompetent under 12 O.S. 1951 § 384, commonly referred to as the "Dead Man's Statute." In support of this contention proponent relies on In re Will of Stires, 92 Okl. 276, 219 P. 695 and In re Creger's Estate, 135 Okl. 77, 274 P. 30, 62 A.L.R. 690.

■ If we concede for the purpose of argument only that the rule announced in Re Will of Stires, supra, and followed in the Cregar case, supra, closes the mouth of a witness under the provisions of 12 O.S. 1951, § 384, and that therefore the evidence of John Thompson, the son of the deceased, is incompetent and inadmissible, it does not follow that the judgment below is not supported by other sufficient and competent evidence to sustain the finding that the deceased was an incompetent person when he executed the contract, deed and will referred to. The medical evidence, as well as the evidence of the proponent of the will, standing alone sustains the trial court's finding of incompetency.

We find that the evidence in the case at bar, after deleting all evidence challenged as in conflict with 12 O.S.1951, § 384, amply supports the trial court's finding of incompetency.

■ Proponent asserts error in the court's refusal to permit the Lauvers, beneficiaries under the will, to testify as to the circumstances surrounding the execution of the will, contract and deed. We find no error in the exclusion of this testimony for the reason that counsel, who drew up the papers, and also the proponent, fully described the circumstances leading up to and including their execution, and the evidence at most would have been cumulative. Furthermore, the proffered testimony in its essential features had reference to the care and attention rendered Thompson, and as to that fact, there is no substantial dispute.

■ Testamentary capacity, or lack thereof, is a question of fact. There is no rule by which it may be determined with precision, but this question should be determined from all the facts and circumstances of each particular case. Generally, the test of testamentary capacity is the testator's capacity to understand the effect and consequences of his acts at the time the will is executed. The record discloses that Mr. Thompson was eighty-five years of age when he executed his will. The evidence supports the finding that he was physically and mentally a sick man, and, therefore, not competent to execute the will. His unsettled state of mind is shown by the testimony of numerous witnesses that he repeatedly stated that he made a mistake by executing the will, and further, that if he became dissatisfied with his dealings with the Lauvers, that he could void the contract and withdraw the deed from the bank. It seems inconceivable that the testator, if competent, would disinherit his son Harry, who had practically spent his entire life on the farm doing the major part or portion of the farm work; and after his mother's death, caring for his father's needs. Mr. Thompson's denunciation of his sons discloses a harsh and unreasonable judgment of their character. In his will he says: "My children have failed and refused to care for me." Quite to the contrary the evidence discloses that his sons spent many years of their mature manhood in the service of their father, and their filial obedience is abundantly established by the record. Characteristic of advancing age his physical condition grew progressively impaired resulting in brain changes, changes of the mind, memory and attitudes indicating symptoms of dementia. A physician who had treated him for years gave it as his opinion that the testator could not have been of sound mind on April 13, 1946, the date of the instruments referred to.

■ As we have often held, the contest of a will is a matter of equitable cognizance and the finding and judgment of the trial court will not be reversed on appeal unless the same are clearly against the weight of the evidence.

Finding no substantial error in the record, the judgment is affirmed.